ORIGINAL

ECF

FILED
JAN 19 2006
U.S. COURT OF FEDERAL CLAIMS

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PHILLIPS/MAY CORPORATION | § | THE OFFICE OF THE CLERK |
| | § | |
| Plaintiff, | § | U.S. COURT OF |
| | § | |
| vs. | § | FEDERAL CLAIMS |
| | § | |
| UNITED STATES OF AMERICA | § | |
| | § | |
| Defendant | § | CASE NO. 06-47 C |

## ORIGINAL COMPLAINT

COMES NOW Plaintiff, Phillips/May Corporation, through the undersigned counsel, and hereby submits it Original Complaint against the United States.

## JURISDICTIONAL STATEMENT

1. Jurisdiction is conferred by 28 U.S.C. § 1491. This action is brought pursuant to the provisions of 41 U.S.C. § 605 and 41 U.S.C. § 609 and seeks a judgment in the total amount of $663,180.14 additional costs incurred by Plaintiff under its contract with Defendant.

2. Plaintiff, Phillips/May Corporation ("PMC") is a design construction firm with its principal place of business at 4861 Sharp Street, Dallas, Texas 75247.

3. Defendant, the United States of America, acting by and through the Department

Claim and the Contracting Officer has not issued a final decision. Accordingly, PMC deems the 2003 Certified Claim denied.

## COUNT I

### MAL-ADMINISTRATION OF THE CONTRACT

8. PMC herein incorporates paragraphs 1 through 7 above.

9. Notice to proceed was issued on May 23, 2001, but PMC was not given sufficient design approval by the Navy to begin work until December 21, 2001.

10. The Contract was scheduled to be designed and built in 256 calendar days. By the time the Navy finally provided an approved design to begin construction, 253 of the 256 days had expired.

11. The Contract was negotiated and was for the design and building of the Project. The Navy had a Design/Build Manual (the "Manual") to be followed in the administration of The Contract. The Navy failed to follow the Manual. In particular, they failed to allow construction to commence during the design as contemplated by the Manual resulting in extensive delays and cost overruns to PMC.

12. The Manual has as one of its goals, to integrate the design and build processes to complete an optimum quality facility. The Navy failed to integrate these processes resulting

in a 256 day contract taking over 800 days to complete.

13. The Manual contemplates the use of "Partnering" which matter was also part of The Contract. The Navy failed to use partnering in this Project.

14. The Manual advises against changes to the design which results in cost or time growth, yet the Navy altered the design numerous times resulting in extending the life of this Contract and resulting in additional costs to PMC.

15. The Manual states that the project will be schedule driven and that both the Navy and the contractor share the responsibility to keep the project on schedule. The Navy failed to take any action concerning the schedule other than to blame PMC for all delay while it was primarily the Navy who was causing the delay.

16. The Manual guards against having rework, yet the Navy required extensive rework instead of complying with their contract inspection requirements of being quality assurance inspector only.

17. The Manual notes that construction shall match the accepted design and the contractor shall not deviate from the accepted design without government approval. The Navy deviated from the accepted design numerous times during the life of this Contract to the detriment of PMC.

18. The Navy also failed to provide a brief, thorough, correct, understandable and contractually enforceable RFP as required. Instead, they vacillated between the RFP, the Final Accepted Design, the Uniform Building Code and Navy Guide Specifications. This

resulted in confusion, rework and delays and impacts to PMC.

19. The Navy required numerous shop drawings to be submitted in violation of The Manual, concerning design/build which expects the design to be ready to be constructed without additional submittals.

20. The Navy failed to complete all closeout work as soon as possible after the beneficial occupancy date (B.O.D.) as contemplated by the Manual. Instead, they delayed the overall contract for several months, all to the detriment of PMC.

21. The Navy failed to cooperate with PMC in constructing this Project all of which impacted and delayed PMC. Some examples are:

(a) A mixing valve problem occurred in the hot water for the Project. The Navy refused to provide information requested by PMC and declared it was PMC's problem to figure it out.

(b) The Navy failed to provide government-furnished telephone lines on a timely basis thereby preventing PMC from timely connecting various equipment as well as phones.

(c) The Navy required PMC to re-test and balance the HVAC systems and would not perform the final punch-out inspection without a new testing and balancing report, even though they already had such a report and even though this report was unnecessary for the Navy to perform its punch-out inspection.

(d) The RFP only provided for one punch-list by the Navy but they developed numerous punch-lists as they would do an initial inspection, provide a punch-list, then reinspect and provide a new punch-list and then they would reinspect again. This happened numerous times on The Project which delayed and extended the Contract significantly.

(e) The Contract provided that the North American Free Trade Agreement (NAFTA) applied to this project but the Navy refused to honor this requirement which also resulted in application of the Buy American Act. This resulted in numerous changes to the Contract. After the completion of this Contract, the Navy determined that it was wrong and NAFTA applied, but all the impacts, delays and cost overruns had already occurred to PMC.

(f) Numerous Requests For Information ("RFI") were made to the Navy on this Project, but the Navy failed many times to provide timely responses which was seven (7) days for most RFI's. There are examples of the Navy taking an excess of more than one hundred (100) days many times to respond to an RFI. The lack of timely information from the Navy resulted in delay, impact and extension of the Contract time to complete The Project.

(g) The Navy failed to cooperate with PMC concerning the design of The Project. The Navy entered into this Contract based on a design submitted by PMC, but after award they rejected this design and required PMC to re-design the Project resulting in

additional delay. The Navy was guilty of delay to other portions of the design and used 253 of the total 256 calendar days of the Contract to deal with the design.

(h) The Navy had a duty to provide quality construction management. Part of their policy in this endeavor was for the ROICC to personally ensure that the Contractor build the Project right the first time. The Navy violated this duty over the entire life of this Contract as a large part of the construction was required by the Navy to be re-done one or more times.

(i) The Navy also had a duty in this design/build arena to inspect differently than in normal bid/build construction. Specifically, they were required to transition from reactive inspector to the role of proactive Quality Assurance Representative. The Navy completely failed to make this transition. Instead, they unleashed their inspector to run this project and to over-inspect this Project all to the detriment of PMC. The Navy violated the inspection clause of the Contract as they never performed their inspection work as "Quality Assurance". Instead they took over and ran the "Quality Control" inspection requirements which were supposed to be under the Contractor's control. In effect, the Navy micro-managed this job through their inspector; they directed the work of both the prime and subcontractors and required various changes to meet their personal desires.

(j) The Navy also violated the Partnering Clause of the Contract. The clause requires working together with the contractor with a common goal in mind and assuring that the work was done right the first time. The Navy continued through their inspector to

order re-work over and over, and in effect, to micro-manage the Project. This resulted in cost overruns and the job was completed substantially behind schedule due to the failure of the Navy to follow the contract requirements for Partnering.

(k) The Navy failed to provide Quality Assurance Reports for this Project. They also failed to develop a Quality Assurance Plan for the Project. They also failed to make a constructability review as required to ensure the project could be constructed in the time allowed. They also failed to ever accept the Contractor's schedule leaving the Contractor unsure as to where he stood on the schedule.

These failures on the part of the Navy, added to their own inspector's failure to perform as required by the Contract, resulted in much re-work, impact and delay to PMC.

## COUNT II

### ROLE OF THE QUALITY ASSURANCE REPRESENTATIVE

22. PMC herein incorporates paragraphs 1 through 7 above.

23. The Navy's Quality Assurance Representative ("QA Rep") on this Project was Tom Schutze. His responsibilities as the QA Rep was to review the contractor's Quality Control Program and deal with the contractor's Quality Control Inspector ("QA Ins"). Mr. Schutze totally failed to follow the contract requirements for his role as the QA Rep. Instead he took over the QC Inspection role and directed the construction. He did the actual

inspection in violation of the Contract. He visited the project site virtually on a daily basis in violation of the Navy's own guidelines. He made changes to the Contract. This was brought to the Contracting Officer's attention, but nothing changed...all of which resulted in additional work, delay and cost overruns to PMC.

24. The QA Rep failed to follow the Navy's own guidelines concerning non-compliance notices. Instead of using them for non-compliance items, for the most part they were used on safety or Buy American Act issues. When they were used for real non-compliance items, he failed to follow the 24 hour corrective time element set out in the guidelines...all of which resulted in disruption to The Project.

25. The Navy's QA Rep also failed to follow their own guidelines concerning developing a pre-final punch-list for final inspection. Instead of a pre-final punch-list as contemplated, the QA Rep developed numerous punch-lists and inspected and re-inspected the finished work resulting in a large delay to the overal completion of the Project and adding to PMC's cost overrun.

## COUNT III

### OVER-ZEALOUS INSPECTION

**A. Examples of Inspection Actions Outside the QA Representative's Authority:**

26. PMC herein incorporates paragraphs 1 through 7 above.

27. The Navy's QA Rep (Tom Schutze) was guilty of over-zealous inspection throughout the life of this Contract. As the QA Rep he was primarily responsible to watch over the contractor's Quality Control Program. He was not to inspect the work being done. Tom Schutze was guilty of this same action on an earlier design/build contract resulting in claims for over-zealous inspection from another contractor, hence the Navy was well aware of his behavior.

28. The following are some examples of Mr. Schutze's over-zealous inspection on this Contract:

(a) On February 22, 2002, Tom Schutze insisted that specific details for certain steel work be submitted to him prior to his approving this work. Such directions were beyond both his authority and responsibility.

(b) On March 25, 2002, Tom Schutze discussed safety issues that had already been addressed.

(c) On March 27, 2002, Tom Schutze discussed the loading requirements on both sides of the east side stem wall contrary to the contract drawings.

(d) On April 2, 2002, Tom Schutze actually did testing on the primer thickness of the paint on the structural steel. Again, he was acting outside his authority and in addition, no such testing was required by the Contract.

(e) On April 2, 2002, Tom Schutze inquired as to why the ductile iron pipe was not mortar lined. This was outside his authority as well as not being a Contract

requirement.

(f) On April 5, 2002, Tom Schutze was on site to discuss the fire main details and roof line details, none of which was within his authority.

(g) On April 11, 2002, Tom Schutze was on site checking certain stainless steel bolts. This was PMC's Quality Control Inspection Program's responsibility.

(h) On April 19, 2002, Tom Schutze inquired about certain control joints in the concrete placement. This was beyond his authority and these control joints were not even a Contract requirement due to the method of construction.

(i) On April 24, 2002, Tom Schutze was on site to discuss various details for upcoming work. In effect, he was running the job which was also beyond his actual authority.

(j) On May 20, 2002, Tom Schutze was on site to discuss the placement of certain trusses.

(k) On May 20, 2002, Tom Schutze made changes to the brick ledge flashing.

(l) On May 28, 2002, Tom Schutze tried to stop the Contractor from continuing the work in progress on that date.

(m) On June 27, 2002, Tom Schutze insisted he be allowed to inspect walls before the Contractor finished them. This violated the Quality Control Inspection Program set out in the Contract.

(n) On June 27, 2002, Tom Schutze requested certain shop drawings. This

was beyond his authority and was also not a Contract requirement.

(o) On October 1, 2002, Tom Schutze required the removal of Contractor personnel from the roof of the building. He alleged a safety violation, but there was no safety violation. He was again acting beyond his authority.

(p) On October 3, 2002, Tom Schutze requested test results on certain soil analysis as well as checking on the percentages of recycled material in the hydro mulch. This was all Quality Control Responsibility.

(q) On October 8, 2002, Tom Schutze did various inspection work in the attic area of the new building.

(r) On October 15, 2002, Tom Schutze stated the roof may not be per the RFF.

(s) On October 23, 2002, Tom Schutze determined the location of fire alarm transmissions antenna and the type of glass to be used in all mirrors.

(t) On November 1, 2002, Tom Schutze did various inspection work above the ceilings concerning insulation duct work.

(u) On December 6, 2002, Tom Schutze determined the work to be done concerning chilled water line insulation repair; the closing of a wall as well as other work dealing with valves for heating and chilled water at the existing Chapel.

(v) On January 27, 2003, Tom Schutze required certain repair work to the duct insulation requiring tweezers and a microscope to cut and place the tiny pieces of insulation on the pipe.

(w) On February 4, 2003, Tom Schutze re-inspected the same attic space he had inspected two weeks previously. His actions were delaying the Contractor.

(x) On February 12, 2003, Tom Schutze reviewed the above ceiling facility.

(y) On February 17, 2003, Tom Schutze inspected certain insulation at the VAV piping using his penknife to check the insulation thickness.

(z) On February 28, 2003, Tom Schutze came up with additional electrical deficiencies that he had previously overlooked.

(aa) On June 30, 2003, Tom Schutze was still preparing punch lists for the Phase I construction, several months after the final inspection for this work had begun.

29. The above 27 examples of over-zealous inspection had a huge impact on PMC. They were constantly re-doing work previously accomplished due to the actions of Tom Schutze. His overall effect on this project increased the amount of work to be done, delayed the Project and resulted in a huge cost overrun to PMC.

**B. Examples of the QA Representative Directing the Work**

30. PMC herein incorporated paragraphs 1 through 7 above.

31. The QA Rep (Tom Schutze) was guilty of directing the Contractor's work throughout the life of this Contract. As the QA Rep, he was responsible for watching over the Contractor's Quality Control Program, not directing the work. Such direction was

beyond both his authority and responsibility. The following are examples of the QA Rep directing the work being done:

(a) On January 15, 2002, Tom Schutze directed the Contractor to remove a tree.

(b) On February 20, 2002, Tom Schutze directed major changes to the foundation design.

(c) On April 5, 2002, Tom Schutze directed the Contractor to notify him of certain tests he wished to observe.

(d) On April 10, 2002, Tom Schutze directed the Contractor to re-test certain subgrade.

(e) On April 18, 2002, Tom Schutze directed how certain box outs were to be done.

(f) On April 20, 2002, Tom Schutze provided directions as to how the plate and bolt patterns for the structural steel were to be done.

(g) On May 9, 2002, Tom Schutze provided directions for correction of steel and plumbing rough-in.

(h) On June 11, 2002, Tom Schutze provided instructions to correct various minor items in the work in progress.

(i) On June 20, 2002, Tom Schutze, contrary to the manufacturer's installation instructions, directed the overlap of paper end on insulation being installed in the walls.

(j) On June 20, 2002, Tom Schutze instructed the Contractor to make the cutouts in the sheetrock tighter.

(k) On July 17, 2002, Tom Schutze pointed out problems that the mechanical subcontractor was having with the insulation installation.

(l) On July 26, 2002, Tom Schutze directed the method of texturing various walls in accordance with the way the ROICC Office wanted them.

(m) On August 13, 2002, Tom Schutze picked out some of the stain colors to be used. On this same date he also directed repairs to a retaining wall.

(n) On August 21, 2002, Tom Schutze directed the work concerning the broom finish on the sidewalk, the tile layout in the bathrooms, the insulation on the chiller lines on the southwest wall and the placement of boots cut in the interior AC supply line.

(o) On August 22, 2002, Tom Schutze directed the tile subcontractor to not cut any of the floor tiles.

(p) On August 28, 2002, Tom Schutze talked to some of the subcontractors at the job site.

(q) On August 28, 2002, Tom Schutze directed the Contractor concerning finishes on doors and bookshelves.

(r) On September 9, 2002, Tom Schutze went over the color issues with the QC representative.

(s) On September 11, 2002, Tom Schutze directed the staining process for certain millwork and specified which products to use.

(t) On September 11, 2002, Tom Schutze changed the finish to be placed on certain millwork. (He changed this four different times.)

(u) On September 11, 2002, Tom Schutze directed additional plaqueing be added to a door.

(v) On September 11, 2002, Tom Schutze picked the colors on the bath partitions, kitchen cabinet Formica and countertops.

(w) On September 20, 2002, Tom Schutze directed the work of the non-slip nosing on the concrete steps as well as certain ceiling work.

(x) On September 20, 2002, Tom Schutze directed how certain mechanical work was to be installed.

(y) On September 20, 2002, Tom Schutze directed the Contractor not to use certain pressure sensitive tape even though it was allowed by the Contract.

(z) On September 21, 2002, Tom Schutze directed the Contractor not to place concrete in the entry steps.

(aa) On September 23, 2002, Tom Schutze continued to direct which stair nosing was to be used for the steps at the main entry. None was specified in the Contract.

(bb) On September 23, 2002, Tom Schutze specifically directed the Contractor

as to which insulation and its manner of installation was to be done on the hot water hydronic piping, all of which was contrary to the Contract as well as the manufacturer's recommendations.

(cc) On September 25, 2002, Tom Schutze directed the Contractor's work concerning the hinges for cabinet doors, method of testing asphalt and installation of the door in the janitor's closet.

(dd) On October 7, 2002, Tom Schutze "requested" the size brackets to be installed in the coat room closet.

(ee) On December 17, 2002, Tom Schutze directed the Contractor to install certain trim on the doors which trim voided the fire rating for the doors.

(ff) On December 30, 2002, Tom Schutze's direction to install certain door trim resulted in interference with the door-closer installation.

(gg) On February 13, 2003, Tom Schutze directed the water heater be raised 18 inches above the pad. This was not a Contract requirement.

(hh) On February 27, 2003, Tom Schutze directed the Contractor to begin installing phone lines at the administrative offices and working towards the back of the facility.

(ii) On April 21, 2003, Tom Schutze directed the removal of certain cabinets in the nursery area, Phase II.

32. The Contracting Officer was well aware of Tom Schutze's actions on this Contract. It was brought to her attention early in the construction by letter dated May 30, 2002. She rejected this letter by her letter dated July 15, 2002. In addition, the daily logs prepared by PMC reflecting Tom Schutze's actions were provided to the Navy on a daily basis through the Contractor's daily reports.

33. Tom Schutze's continual directions and running of this Project had severe effect on PMC resulting in delay, confusion, re-work and cost overruns.

## COUNT IV

### MICRO-MANAGEMENT OF THE CONTRACT

34. PMC herein incorporates paragraphs 1 through 7 above.

35. The Navy insisted on holding numerous meetings with the Contractor and its subcontractors. Such meetings were contrary to the Quality Control Program and interfered with the Contractor's right to manage and control the project. These meetings also interfered with the Contractor's right to proceed with the work.

## COUNT V

### CONFLICTS WITH THE QUALITY ASSURANCE REPRESENTATIVE

36. PMC herein incorporates paragraphs 1 through 7 above.

37. The Navy's QA Rep (Mr. Tom Schutze) had numerous conflicts with Contractor's job superintendent. Instead of performing as a QA Rep as contemplated by the Contract, Tom Schutze continued to try to run this Project and demand whatever he or the ROICC office wanted whether or not required by the Contract. This resulted in delay and causing cost overruns to the Contractor.

38. Specific examples involve stair nosing of a particular type and a threat that if he (Tom Schutze) didn't get the type he wanted, he would direct the Contractor to tear out what the Contractor intended to install.

39. Tom Schutze insisted on certain insulation for the hydronic piping even thought it was not required by the Contract.

40. Tom Schutze alleged safety violations which didn't exist in order to disrupt the Project work.

41. Tom Schutze threatened to have the Contractor's QC Inspector removed from the job when the QC inspector challenged his authority to direct work. The removal never happened.

42. Tom Schutze insisted on special services and favors from the Contractor in direct breach of a government employee's code of conduct. Tom Schutze threatened to make it extra hard on the Contractor if he didn't receive these services and favors. The Contractor, trying to get along, rendered such services and favors, such as providing Tom Schutze various construction materials during the life of the Project and by actually loading

these items on Tom Schutze's personal trailer.

43. Tom Schutze's responsibility was to watch over the Contractor's QC Program. Instead, he inspected the work constantly; he directed the work during the life of the Project and he threatened and intimidated the Contractor...all of which was in violation of the Contract. This resulted in various impacts to the Contractor.

## COUNT VI

### IMPOSSIBILITY

44. PMC herein incorporates paragraphs 1 through 7 above.

45. It was impossible to design and build The Project in the time provided in the Contract due to the Navy's failure to administer this Contract in accordance with their own rules and regulations. Primarily, The Project had to be built while it was being designed. The Navy would not allow this. Of the total 256 days in the Contract, the Navy used up 253 of the days in review before they would allow construction to proceed. It was impossible in this situation to design and build this project in 256 days.

# COUNT VII

## DAMAGES

46. PMC herein incorporates paragraphs 1 through 7 above.

| | | |
|---|---|---|
| Original Contract Amount | $ 1,197,333.00 | |
| Contract Modifications | 32,052.30 | |
| Total Original Contract | | $1,229,385.30 |

## CALCULATION OF DAMAGES CLAIMED

| | | |
|---|---|---|
| Cost Overrun | $ 820,362.14 | |
| Liquidated Damages Withheld | 107,550.00 | |
| **Total Cost Overrun** | | **$ 927,912.14** |
| **Less:** | | |
| Contractor-caused Cost Overruns: | | |
| 1. Unacceptable asphalt paving | $ 35,107.00 | |
| 2. Out-of-Place Anchor Bolts | 14,782.00 | |
| 3. Power-wash Damaged Linoleum | 13,556.00 | |
| 4. Concrete Deficiencies | 28,886.00 | |
| 5. Increased Mechanical Costs | 50,914.00 | |
| 6. Misc. Subcontractor Problems | 44,212.00 | |
| **Total Contractor-caused Cost Overruns** | | **(187,457.00)** |
| **Payment- Adjudication Before the ASBCA** | | **( 44,775.00)** |
| **Payment- ADR Before the ASBCA** | | **( 32,500.00)** |
| **TOTAL DAMAGES CLAIMED** | | **$ 663,180.14** |

**WHEREFORE,** Plaintiff, **Phillips/May Corporation** demands judgment in its favor and against Defendant, the United States, in the amount of **Six Hundred, Sixty-Three Thousand, One Hundred Eighty Dollars and Fourteen Cents** ($663,180.14), plus costs, attorney fees and any other relief this Court deems appropriate.

Respectfully Submitted,

David A. Tomlinson

David A. Tomlinson
5716 Tee Box Court
Granbury, Texas 76049
817-578-8199
Attorney of Record for Plaintiff
PHILLIPS/MAY CORPORATION

Dated this 18th day of January, 2006