**DEPARTMENT OF THE NAVY**
NAVAL FACILITIES ENGINEERING COMMAND SOUTHEAST
JACKSONVILLE, FL 32212-0030

4365
Code ACQ11
01-D-0257
04-006
9 Jun 06

**FINAL DECISION 06-S-019**

**CERTIFIED - RETURN RECEIPT REQUESTED**

Phillips/May Corporation
4861 Sharp Street
Dallas, TX 75247

Subj: CONTRACT N62467-01-D-0257; RELIGIOUS MINISTRIES FACILITY, NAVAL AIR STATION – JOINT RESERVE BASE, FORT WORTH, TEXAS

Gentlemen:

Your letter of November 7, 2003, requests a Contracting Officer's Final Decision (COFD) regarding your claim for alleged mal-administration of the contract, overzealous inspection and impossibility of performance. Your claim, as originally submitted, sought a contract price increase of $740,546.14. On May 7, 2004, Phillips/May Corporation (P/MC) and the Defense Contract Audit Agency (DCAA) participated in an entrance conference to facilitate an audit of your claim. Based on amended accounting data you provided to DCAA at the entrance conference, you revised the claim value to $694,946.00. By electronic mail transmittal dated October 11, 2004, your Mr. Gilbert Phillips advised the undersigned that you were further reducing the value of your claim to $624,927.00 in recognition of the parties' agreement to settle those claims associated with Armed Services Board of Contract Appeals (ASBCA) docket numbers 54348, 54393 and 54421.

Upon review of your claim and other pertinent information, I have determined that the preponderance of the issues cited therein are not properly before the Contracting Officer. I have also determined that your claim is based on an inappropriate theory of recovery. For these reasons, which are discussed in greater detail in the paragraphs that follow, your claim is denied in its entirety.

*Improperly Submitted Issues*

Your November 7th claim is predicated on various purported Government-responsible issues and seeks compensation based on a modified total cost theory of recovery. In addition to this claim, during the period from July 10, 2003, through November 12, 2003, P/MC submitted nine claims under the subject contract for consideration by the Contracting Officer. A brief description of

these claims as well as the specific relief sought by each is provided herewith as Enclosure (1). As noted previously, a significant portion of the issues you identify in your November 7th claim and contend are the cause of the cost overrun for which you are seeking compensation, were included in the entitlement arguments put forth in the claims listed on Enclosure (1). Each of the claims noted on Enclosure (1) was appealed by P/MC to the ASBCA. Of the nine, five were denied by the ASBCA in their entirety and have not been timely appealed by P/MC. The remaining four were resolved by a combination of settlement agreements between the parties and decisions of the ASBCA. In point of fact, each claim is now fully adjudicated. Consequently, pursuant to the legal principles of res judicata and collateral estoppel, P/MC is precluded from using the issues delineated in the adjudicated claims as a basis for the current claim. Using the numbering convention established within P/MC's claim, the following portions of your November 7th claim were addressed in the previously adjudicated claims:

*I. Mal-Administration*

*A. Design/Build Contract and B. Government Guidelines for Design/Build*: Much of the text of these sections of your current claim is dedicated to merely reciting passages from the Design/Build Manual. You claim that the Government's most significant violation in this area is that you were not allowed to work until the final approval of your Civil and Structural Design on December 21, 2001. While the fact that the subject contract was of the Design/Build variety and the use of the Design Build Manual are not issues which are specifically mentioned in the texts of the Enclosure (1) claims, the record of the ASBCA hearing for all the claims contains accusations by P/MC regarding the Government's alleged failure to properly administer the Design/Build aspects of the contract, or more specifically to follow the Design/Build Manual. In fact, P/MC's opening statement for the hearing specifically mentions the issue of accelerated construction and argues that the Government inappropriately did not allow it to commence construction until December 21, 2001. Additionally, much of P/MC's opening round of direct examination was spent attempting to establish that the Government denied it the right to accelerated construction. Consequently, while it is the Government's position that its actions have been consistent with the guidance provided in the Design/Build Manual, such issues are not properly before the Contracting Officer inasmuch as they were included in your entitlement arguments presented at the hearing for the Enclosure (1) claims.

*C. Other Examples of Mal-Adminstration*: *5, 7, 8 and 9*: For these "examples," P/MC puts forth the notion that the approved final design drawings are the controlling documents for project construction and that upon approval of the final design the Government forfeits its right to demand construction in accordance with the request for proposal. These issues are not properly before the Contracting Officer as they formed the basis of P/MC's claim of August 27, 2003 (see Enclosure (1), ASBCA 54431) and were fully resolved by ASBCA's decisions of April 2, 2004, and June 30,2005. It is noteworthy that in his decision of April 2, 2004, Administrative Judge Coldren noted that "(c)onsequently, like almost any procurement I'm aware of with technical

proposals, the Government reserves the right to rely on its own solicitation in the event of errors, conflict, and omissions. The RFP is the controlling document."

*D. Cooperation*: Much of P/MC's testimony during the first day of the ASBCA hearings for the Enclosure (1) claims was dedicated to describing how the Government's alleged failure to cooperate impacted its performance under the contract. Since the Enclosure (1) claims are fully resolved, the general issue of Government cooperation and its impact on contract performance is not properly before the Contracting Officer. Notwithstanding, the following information is provided with regard to the specific examples alleged by P/MC.

- *(ii) Government Furnished Telephone Lines*: This issue and its alleged impact on P/MC's performance was argued in great detail by P/MC as noted in the transcript for the first day of the hearing for the Enclosure (1) claims. Thus, the issue is not properly before the Contracting Officer.
- *(iii) Testing & Balancing Report (TAB)*: This issue is not properly before the Contracting Officer inasmuch as it was included in P/MC's entitlement argument for its claim of July 10, 2003, (see Enclosure (1), ASBCA 54331) which was fully resolved by ASBCA decisions of March 30, 2004, and June 30, 2005.
- *(iv) Punchlist*: P/MC refers to this item as perhaps the most significant area for which the Government allegedly failed to cooperate during performance of the contract. Notwithstanding, this issue is not properly before the Contracting Officer inasmuch as it was also included in P/MC's entitlement argument for its claim of July 10, 2003 (ASBCA 54331), which was fully resolved by ASBCA decisions of March 30, 2004, and June 30, 2005.
- *(v) Buy American/NAFTA*: P/MC refers to this item as perhaps the second most significant area for which the Government allegedly failed to cooperate during performance of the contract. Notwithstanding, this issue is not properly before the Contracting Officer inasmuch as it was the basis for P/MC's claim of July 24, 2003 (see Enclosure (1), ASBCA 54348), which was resolved by mutual agreement of the parties as confirmed in modification P00016 to the contract which was bilaterally executed on December 21, 2005.
- *(vii) Reason for Delay in Accepting Phase I*: This issue is not properly before the Contracting Officer inasmuch as it was the basis of P/MC's claim of July 10, 2003 (see Enclosure (1), ASBCA 54331) which was fully resolved by ASBCA decisions of March 30, 2004, and June 30, 2005.
- *(viii) Black Mastic Delay*: The Government responded to the Contractor in a timely manner and any partial delay claimed by the Contractor was determined to be concurrent delay and not on the critical path of construction according to the Contractor's schedule.
- *(xi) Design Phase*: These issues are not properly before the Contracting Officer inasmuch as they formed the basis of P/MC's entitlement arguments for its claims of August 8, 2004 (see Enclosure (1), ASBCA 54393) and August 27, 2003 (see Enclosure

(1), claim control number 04-002). Such claims were fully resolved by combination of mutual agreement of the parties (modification P00016) and the ASBCA's decision of June 30,2005.

*1. E. Quality Construction Management by the Government; II. Role of the Quality Assurance Representative (QA Rep); and III. Over-Zealous Inspection*: While P/MC lists these categories separately, they offer essentially the same argument for each. That is, that the conduct of Mr. Thomas Schutze, the Government's Quality Assurance Representative, during performance impeded P/MC's ability to successfully complete the project. More specifically, you claim that Mr. Schutze personally directed and over-inspected your work causing you to incur delays and increased cost of performance. While we submit that Mr. Schutze at all times conducted himself in a manner consistent with section 01459, Quality Control, of the contract, these issues are not properly before the Contracting Officer as P/MC previously presented them as a basis for the Enclosure (1) claims.

**Quality Construction Management and Role of the Quality Assurance Representative**: A review of the record of the hearings for the Enclosure (1) claims indicates numerous instances where P/MC contends that the Mr. Schutze acted outside of his authority as the QA Rep. The most significant of such instances was in regard to your claim of November 11, 2003 (ASBCA 54484). The following excerpts from your opening and closing statements for the hearing for ASBCA 54484 clearly demonstrate that these issues were previously addressed:

> And this -- while this work was going, had just begun, the Quality Control Inspector, Mr. Tom Schutze, who is not an engineer, is not qualified to make engineering decisions, nonetheless started making engineering decisions.
>
> He related that he was concerned with portions of the foundation. And this is all set out in the daily reports. This was not just he says/he says. He stopped part of the work. He said that you're not going to be able to place any steel and concrete in certain parts of this foundation until I get some answers from your design engineer about this foundation.
>
> If the contract was changed concerning these -- the foundation work requirements, these were changes required by the Government, that Tom -- that the Quality Assurance Representative directed these changes.
> That these changes increased the contractor's costs, and that the contractor is entitled to an equitable adjustment for his increased costs for doing this additional work.
>
> The contractor didn't volunteer to add almost $40,000 worth of foundations to his job. Contractors don't do that. Somebody had to direct him to do this.

> And the testimony is overwhelming that Mr. Schutze says you will not place any concrete or steel in these certain areas until you do what I'm telling you you're going to do.
>
> Mr. Schutze has been charged with directing other things throughout some of the hearings that the Board has heard this week. This is not the first time this happened.

**Overzealous inspection**. The following excerpt from the transcript for day one of the ASBCA hearing clearly indicates that overzealous inspection was one of the issues upon which the Enclosure (1) claims was based:

> Q (From Tomlinson) Now, you've just testified that you worked with the Contractor and you partnered with the Contractor. Isn't it true, Mr. Schutze, that you have been sued more than once through the Navy for over-zealous inspection?
>
> MR. McMUNN: I'm going to object to that; that's irrelevant to this case.
>
> MR. TOMLINSON: Part of our allegations are over-zealous inspections, Your Honor. That's what we said, that they wouldn't accept the building because of the over-zealous nature of the inspection.
>
> JUDGE COLDREN: I don't think we're going to try whether he was over-zealous on other contracts, we're going to try whether he was over-zealous on this one.
>
> MR. TOMLINSON: You say not?
>
> JUDGE COLDREN: We're not going to try it on other contracts, so I'm not going to let you go to a different contract. If you say he's over-zealous here, that's what we're here for.

Indeed, in his closing arguments on day one of the hearing, P/MC's attorney, Mr. David Tomlinson advised the Board that:

> We want you to hold that the Government was guilty of over-inspection of the substantially completed new construction. We want you to hold that Appellant was delayed by the Government's failure to timely accept the new construction. We want you to hold the Government intentionally delayed accepting the new construction. We want you to hold that the Government is guilty of bad faith in dealing with the Appellant on this issue of timely acceptance. We want you to hold that Appellant is entitled to at least 82 days of time and all related costs. We want you to hold that Appellant is entitled to breach of contract

> damages due to the Government's acting in bad faith. ....... We want you to hold that design-build contracts are normally built while they are designed.

*Comments on Design/Build and the Quality Assurance Program*

As noted hereunder, it is the Government's position that P/MC is prevented from raising these issues in the current claim inasmuch as they were previously cited as a basis for the Enclosure (1) claims. Notwithstanding this position, P/MC has presented information in its arguments for these issues we feel compelled to address. The Design/Build Manual (Tab 6 to your claim) and NAVFAC publication P-445 (Tab 16 to your claim) are generic guidance documents developed by NAVFAC to facilitate the Design/Build process and the Construction Quality Management Program. They are not specific to any particular contract and are not contractually binding. Given the specific attributes of a particular project and using these documents as a guide, the Government develops requirements which are unique to the particular contract. For the subject contract, the Design/Build process was governed by specification section 00911, entitled DESIGN REQUIREMENTS. Likewise, the Quality Assurance Program for this contract was governed by specification section 01450, entitled QUALITY CONTROL. P/MC has persistently failed to recognize that while it is indeed contemplated in the Design/Build manual that design and construction occur concurrently to the extent practicable, it is section 00911 which sets forth the extent to which accelerated construction is allowed by the contract. Paragraph 1.15.2 of section 00911 allows the contractor to proceed with work in 4 defined areas "upon acceptance of the design and approval of permits for that portion of the work." What P/MC has consistently failed to recognize is that it had the responsibility to submit an accelerated construction design package which detailed its design for the identified area. Consequently, because P/MC did not provide such a design package, it was not given authorized to proceed in these areas until its civil and structural package was approved.

*Improper Theory of Recovery*

Even if arguendo, the Government's position that the issues delineated in P/MC's current claim have either been fully adjudicated or are unfounded is incorrect, P/MC incorrectly uses a modified total cost method to calculate damages. The use of total cost or modified total cost methods of recovery are extraordinary remedies to be used only when the use of other more precise methods is not practical. In order to recover under the modified total cost method the contractor must prove 1) the impracticability of proving its actual losses directly; 2) the reasonableness of its bid; 3) the reasonableness of it actual losses directly; and 4) lack of responsibility for the added costs. *Propellex Corp v. Brownlee*, 342 F.3d 1335, 1339 (Fed. Cir. 2003)(citing Servidone Constr. Corp. v. United States, 931 F.2d at 861). P/MC has not met its burden of proof for any of the fours conditions. These conditions are discussed here in greater detail.

Subj: CONTRACT N62467-01-D-0257; RELIGIOUS MINISTRIES FACILITY, NAVAL AIR STATION – JOINT RESERVE BASE, FORT WORTH, TEXAS

1. ***A Contractor Must Establish the Impracticability of Proving its Losses Directly:*** Aside from the mere statement that "(f)or P/MC to ascertain the exact amount of their damages attributed to the Government is, if not impossible, certainly very impractical," P/MC offers no explanation as to why it cannot directly calculate its alleged losses. Your claim is conspicuously devoid of any substantive discussion as to why a modified total cost method of recovery is appropriate for this claim. To the contrary, by submitting the claims listed on Enclosure (1) and proposing a defined value for contractor-responsible costs in the current claim, P/MC demonstrates a belief that it could accurately assign liability for and directly quantify the predominance of its alleged cost overruns. For the claims listed on Enclosure (1), which were submitted contemporaneously to the claim currently at issue, P/MC was seeking $541,067.00 in total relief. This amount is comprised of $458,267.00, sought as a contract price increase, and $82,800.00, sought as the return of liquidated damages associated with the 184 day Contract Completion Date extension sought in the claims (184 days x $450.00/day). Assuming P/MC acted in good faith, by virtue of its submittal of the Enclosure (1) claims, P/MC was attesting to the Contracting Officer that it was indeed practical to directly prove $541,067.00 of the alleged loss experienced on the contract. Furthermore, while it will be discussed later in this letter why the Government believes such costs are understated, P/MC has also directly quantified what is believes is its contribution to the alleged loss experienced on the contract.

2. ***A Contractor Must Establish the Reasonableness of Its Bid:*** Again, your claim offers no discussion with regard to the reasonableness of your bid therefore the Government finds you have not satisfied this requirement .

3. ***A Contractor Must Demonstrate the Reasonableness of its Actual Costs:*** Your claim offers no discussion with regard to the reasonableness of actual costs. In fact, based on the audit of your claim performed by the Defense Contract Audit Agency (DCAA), your ability merely to accurately accumulate and report your actual costs is questionable. In its audit report number 03511-2004M17200004 of September 30, 2004, DCAA confirmed its previous determination that:

> Phillips/May's accounting system was inadequate in part for accumulating costs under prospective government contracts. The contractor does not have a method to allocate indirect costs to government contracts. The contractor's accounting system was considered to be adequate for the accumulating and reporting of direct labor and other direct costs only on government contracts.

In its September 2004 report, DCAA rejected $46,883,00 of costs proposed by P/MC for "Subcontracts & Miscellaneous Services" due to the fact that such costs could not be reconciled to existing purchase orders and, in some cases, were unallowable as they were incurred pre-contract.

Given the inadequacies of your accounting system, your inclusion of improper costs in the amount submitted as incurred under the contract, and the fact that you offer no discussion as to the reasonableness of your costs allegedly incurred, the Government has little confidence that the $2,049,747.44 you propose accurately represents the allowable, allocable and reasonable costs incurred for the project.

4. ***A Contractor Must Demonstrate a Lack of Responsibility for the Added Costs***: Your claim acknowledges a P/MC contribution of $187,366.00 to the alleged contract loss. For multiple reasons, we contend that this contribution is significantly understated. First, the amount recognizes only the direct costs associated with the issues for which you accept responsibility. Notwithstanding the previously discussed inadequacy of P/MC's accounting system in allocating indirect costs to Government contracts, your proposals for change order work requested by the Contracting Officer during performance of the contract routinely included amounts for indirect costs. Such costs included Insurance/Taxes/Fringe Benefits, Sales Tax on Rental Equipment, Field Overhead, Prime's Home Office Overhead and Prime's Overhead on Subcontractor, all calculated as percentages of direct costs. Your assessment of your contribution to contract losses should have included both the direct and indirect components of such costs. Using percentages consistent with your proposals submitted for change order activity during performance, we calculate indirect costs in the amount of $29,500.08 as being attributable to the $187,366.00 of direct costs included in your position. Please see Enclosure (2) for the specific calculation. In addition, while your claim lists 87 days of delay as attributable to your acknowledged "mismanagement of subcontractors," it fails to recognize the impact of such delay on your liability for liquidated damages and is not based on a daily field office overhead rate consistent with your previous delay proposals. The 87 days of delay you acknowledge as your responsibility appear to be comprised of 49 days associated with so-called Phase I, and 38 days associated with so-called Phase II. Consequently, the amount of liquidated damages attributable to such delays would be $22,563.00. Please see Enclosure (3) for the specific calculation. You propose $44,121.00 as field office overhead attributable to P/MC-responsible delay calculated at an average daily rate of $507.14 with no additional markups. While your claim provides no discussion with regard to the time period involved with the acknowledged delay sources, we can approximate the timing of two of the issues inasmuch as they appear to coincide with issues addressed in other P/MC claims. The 21 days of delay you acknowledge for problems related to "Chilled Water Line Installation" would seem to logically coincide with your claim of July 24, 2003 (see Enclosure (1), ASBCA 54349).

Subj: CONTRACT N62467-01-D-0257; RELIGIOUS MINISTRIES FACILITY, NAVAL AIR STATION – JOINT RESERVE BASE, FORT WORTH, TEXAS

For the delay associated with that claim you proposed a daily field office overhead rate of $818.21 plus home office overhead at 5 percent of total cost. Likewise, the 17 days of delay you propose for "Problems with Absolute Mechanical" would seem to correspond to your claim of July 10, 2003 (see Enclosure (1), ASBCA 54331). For the delay associated with that claim you proposed a daily field office overhead rate of $1,106.39 plus home office overhead at 5 percent of total cost. A review of the daily field office rates proposed in the Enclosure (1) claims indicates that $507.14 was the minimum rate for any delay period rather than the average daily rate as is contended in your current claim. As indicated in Enclosure (4), the weighted average of the daily rates you proposed for the Enclosure (1) claims is $920.28. We submit this would be a more appropriate estimate for an average daily rate. When the 87 days of delay acknowledged as P/MC-responsible are burdened with an average daily field office overhead rate of $920.28 as well as a 5 percent home office overhead rate, the result is field office overhead in the amount of $84,067.58 rather than the $44,121.00 proposed. Thus, P/MC's proposed contribution is understated by an additional $39,946.58.

Given the points noted above, we contend that as a minimum P/MC omitted $92,009.66 of directly quantifiable costs from its acknowledged contribution to contract losses. It is a principal contention of your claim that actions of the Government contributed to your cost overruns by causing "delays, disruptions, and interferences that caused suspension of work, labor inefficiencies, re-work of existing work, and other additional costs to the Contractor," which presumably cannot be directly quantified. Following your logic, it would seem that along with the directly quantified costs for which you acknowledge responsibility there would exist separate costs resulting from the inefficiencies associated with your actions for which it would not be practical to directly quantify. Your claim provides no discussion of such issues.

By submitting the Enclosure (1) claims, P/MC definitively demonstrates the belief that such claims were the cause of $541,067.00 of its losses experienced on the contract. Logically then, $541,067.00 should have been removed from the losses asserted in your modified-total-cost claim. Thus, the starting point of your claimed amount calculation should have been $153,879.00 rather than the $694,946.00 actually proposed. To do otherwise would be tantamount to a second bite at the apple. As previously noted, it is the Government's position that the the costs associated with issues for which P/MC acknowledges responsibility is understated by $92,009.66. When this amount and the $46,883.00 of costs rejected by DCAA are subtracted from the alleged overrun, the residual amount is further reduced from $153,879.00 to $15,036.78. Please see Enclosure (5) for the specific calculation. Consequently, notwithstanding our stated positions that your claim fails with respect to both entitlement and method of recovery, we submit that had an amount been properly calculated in accordance with your chosen method of recovery, your request for compensation should have at most been listed as $15,036.78. Undoubtedly, such an amount can be more than adequately explained by

inefficiencies associated with acknowledged P/MC-responsible costs, other P/MC-responsible issues and potential accounting inaccuracies.

We submit that to the extent that P/MC incurred costs under the contract in excess of what was anticipated, such costs emanated almost entirely from your fundamental lack of understanding of the design-build process. Whenever confronted with design issues during contract performance, as a matter of course P/MC pressed the Government to provide the requisite design solutions rather than immediately conferring with its A/E, as is contemplated by the design-build process. The chilled water piping claim is a primary example of such conduct. While the chilled water piping issue was first brought to the Government's attention on January 2, 2002, the record (RFI 29) indicates that P/MC did not seek direction from its A/E until July 22, 2002. Also, we do not dispute that P/MC may have incurred additional design and likely construction costs precipitated by the necessity of having to reconcile its design to the RFP requirements after submittal of its final design. However, as confirmed by Administrative Judge Coldren in his bench decisions for the Enclosure (1) claims, such costs are the sole responsibility of P/MC. As Administrative Judge Coldren pointed out in his April 2, 2004, decision regarding docket number 54421 "(p)aragraph 1.14.4 of Section 0091 of the Statement of Work provides that, "Acceptance of the final design shall not be construed as a waiver from the design/build requirements expressed within this document unless variations had been specifically noted by the contractor and accepted in writing by the contracting officer." As P/MC notes numerous times in the current claim, there were many instances where the Government required it to reconcile its post-final design with the RFP. For the aforementioned reasons we contend that the costs associated with effecting post-final design changes are the responsibility of P/MC. Yet, P/MC fails to take responsibility for any such costs in its modified-total-cost calculation. Its conduct in relation to the foundation design and workmanship is also a prime example of how P/MC's actions created its cost overruns. Consistent with his charter, as described in the minutes of the Partnering and Pre-Design Conference of May 23/24, 2001, the Government Construction Representative (CR) brought various foundation design deficiencies to the attention of P/MC. While such notice was made to P/MC, no design directives or other specific remedies were mandated by the Government. Ultimately, it was P/MC's engineer, Dr. Alfredo Cervantes, who visited the site, evaluated the design issues, and recognized the necessity of modifying the foundation design. In addition to the costs associated with the engineering effort required to modify the deficient elements of the foundation design, it is suspected that P/MC incurred significant additional expense due to the performance of rework made necessary by poor workmanship and a failure to construct the foundation in accordance with the final design. On numerous occasions P/MC incorrectly placed concrete and reinforcing steel in the column footings thereby necessitating removal and rework. Also common were inadequate splice extensions for reinforcing steel. On various occasions P/MC was required to rework concrete due to its failure to reset reinforcement steel which had shifted during pouring, while the concrete was still in a plastic state. One of the more noteworthy examples of significant rework caused by poor workmanship occurred during construction of the foundation stem walls. P/MC placed reinforcement steel in the stem walls in

such a configuration that the clearance between the steel and the wall's forms, as required by the foundation design and the American Concrete Institute code, could not be achieved. P/MC chose to achieve the necessary clearance by expanding the wall thickness from 8 inches to 9 inches. While these examples in no way constitute a complete list of design and construction problems encountered by P/MC, they are representative of the myriad of P/MC-caused design and workmanship related problems which had to be overcome during contract performance. Incredibly, P/MC is once again attempting to assign responsibility to the Government for its mismanagement of the contract and failure to promptly and appropriately resolve its own deficient design. Inasmuch as it is the Government position that P/MC's actions alone created any cost overruns experienced under the contract, no additional compensation is forthcoming.

*Conclusion*

In summary, your claim is being denied for two primary reasons. First, you fail to demonstrate the existence of any of the four conditions required for recovery under a modified-total-cost method. Second your claim is based in large part on previously adjudicated issues. It is noted in section VI., paragraph A. (page 33) of your current claim that "(a)ny recovery for those claims will likewise be deducted from this modified total cost claim." Implicit in this language is the clear acknowledgment that the issues underlying the claims identified on Enclosure (1) are again included in the entitlement arguments put forth in the November 7th claim. It is well established in Government contracting case law that parties may seek remuneration for alleged inequities only one time.

This is the Final Decision of the Contracting Officer. This Decision may be appealed to the Armed Services Board of Contract Appeals, which is the authorized representative of the Secretary for hearing and determining contract disputes. If you decide to appeal this decision, written notice thereof must be mailed or otherwise furnished to the Armed Services Board of Contract Appeals, Skyline Six, 5109 Leesburg Pike, 7th Floor, Falls Church, VA 22041, within ninety days from the date you receive this decision. A copy thereof shall also be furnished to the Contracting Officer from whose decision the appeal is taken, at the following address:

Naval Facilities Engineering Command Southeast
Attn: Acquisition Director
P.O. Box 190010
North Charleston, SC 29419-9010

The notice should indicate that an appeal is intended, should reference this decision, identify the contract by number, and state the amount in dispute. The rules of procedures of the Armed Services Board of Contract Appeals are in the Department of Defense Federal Acquisition Regulation Supplement (DFARS), Appendix A, Part Two. Optional Accelerated Procedures are available in appeals involving $50,000 or less and Small Claims (expedited) procedures are available in appeals

involving $10,000 or less. In lieu of appealing to the Board of Contract Appeals, you may bring action directly in the Court of Federal Claims* within 12 months of the date you receive this decision (*except as provided in Section 4 of the Contract Disputes Act (Maritime Contracts)).

Sincerely,

GREGORY T. McHONE
Head, Acquisition Policy and Support Branch
Contracting Officer

Copy to:
ROICC Fort Worth

| ASBCA Number | Claim Control # | COFD Number | COFD Date | Rec'd at ROICC | Claim Value | Days Req'd | Main Claim Issue | Disposition |
|---|---|---|---|---|---|---|---|---|
| 54348 | 03-021 | N/A | 19-Mar-04 | 28-Jul-03 | $44,149 | 0 | Trade Agreement Act versus NAFTA. Listed claim value is in accordance with P/MC's quantum proposal of 25 May 04. | Settled in full. Settlement Agreement executed 21 Dec 04 and confirmed on mod P16 of 28 Jan 05. |
| 54349 | 03-022 | 04-S-004 | 8-Mar-04 | 25-Jul-03 | $24,055 | 28 | Chilled Water Delay Claim | Denied in total by ASBCA decision of 1 Apr 04. |
| 54394 | 03-023 | 04-S-005 | 10-Mar-04 | 13-Aug-03 | $38,834 | 0 | Overhead related to Mod P14 extension. | Denied in total by ASBCA decision of 1 Apr 04. |
| 54393 | 03-024 | 04-S-006 | 19-Mar-04 | 12-Aug-03 | $18,997 | 33 | Redesign costs arising from post-proposal changes. | Settled in full except for EAJA costs. Settlement Agreement executed 21 Dec 04 and confirmed on mod P16 of 28 Jan 05. Final resolution accomplished by ASBCA decision of 30 Jun 05. |
| 54331 | 03-025 | 04-S-007 | 19-Mar-04 | 11-Jul-03 | $95,260 | 82 | Phase II Delays | ASBCA decision of 30 Mar 04 granted 40 days of delay. Final resolution accomplished by ASBCA decision of 30 Jun 05. |
| 54332 | 03-026 | 04-S-008 | 24-Mar-04 | 11-Jul-03 | $13,049 | 18 | Leaking Gas Line Delay | Denied in total by ASBCA decision of 30 Mar 04. |
| 54333 | 03-027 | 04-S-009 | 24-Mar-04 | 10-Jul-03 | $94,706 | 0 | Overhead On Various Time Extensions | Denied in total by ASBCA decision of 31 Mar 04. |
| 54421 | 04-002 | 04-S-011 | 31-Mar-04 | 15-Sep-03 | $79,733 | 0 | Various Design Issues | ASBCA decision of 30 Mar 04 granted cost for electrical upgrade & denied all other issues. Quantum settlement (except EAJA) part of mod P16 adjustment. Fully resolved by ASBCA decision of 30 Jun 05. |
| 54484 | 04-003 | 04-S-010 | 26-Mar-04 | 12-Nov-03 | $49,484 | 23 | Gov't directed changes to foundation reinforcing steel | Denied in total by ASBCA decision of 2 Apr 04. |
| | | | | **$458,267** | **184** | **Subtotal** | | |
| | | | | $82,800 | $450 | Liquidated Damages associated with requested CCD extension (184 x $450 = $82,800) | | |
| | | | | **$541,067** | | **Total Relief Sought** | | |

**COFD 06-S-019**
**Enclosure (1)**
**Page 1 of 1**

| Issue | Subcontractor | Prime Material | Prime Labor | Prime Equipment Rental | Prime Equipment Owned | Proposed Field Office Expense | Acknowledged P/MC Costs |
|---|---|---|---|---|---|---|---|
| Unacceptable Asphalt Paving | $32,731.00 | $0.00 | $2,351.00 | $0.00 | $25.00 | $0.00 | $35,107.00 |
| Out of place anchor bolts | $0.00 | $445.00 | $13,565.00 | $747.00 | $25.00 | $0.00 | $14,782.00 |
| Incorrect Sidewalk placement | $0.00 | $3,722.00 | $23,267.00 | $1,834.00 | $63.00 | $0.00 | $28,886.00 |
| Increased Mechanical Costs | $50,914.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $50,914.00 |
| Subcontractor Problems (87 Days of Delay) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $44,121.00 | $44,121.00 |
| Linoleum Corrections | $7,568.00 | $5,747.00 | $0.00 | $216.00 | $25.00 | $0.00 | $13,556.00 |
| Totals | $91,213.00 | $9,914.00 | $39,183.00 | $2,797.00 | $138.00 | $44,121.00 | $187,366.00 |

| | | |
|---|---|---|
| **Prime Contractor Work** | | |
| Direct Material | | $9,914.00 |
| Direct Labor | | $39,183.00 |
| Ins/Taxes/Fringe Benefits (% of DL) | 40.00% | $15,673.20 |
| Rental Equipment | | $2,797.00 |
| Sales Tax on Rental Equipment | 8.25% | $230.75 |
| Equipment Own&Oper Expense | | $138.00 |
| Subtotal | | $67,935.95 |
| Field Overhead | 10.00% | $6,793.60 |
| Subtotal | | $74,729.55 |
| **SubContractor Work** | | $91,213.00 |
| Prime's Home Office Overhead | 3.00% | $2,241.89 |
| Prime's Overhead on Subcontractor | 5.00% | $4,560.65 |
| Proposed Field Office Expense | | $44,121.00 |
| P/MC Proposed Costs plus Burdens | | $216,866.08 |
| Less Proposed P/MC Costs | | ($187,366.00) |
| Inappropriately Omitted Burdens | | $29,500.08 |

| | |
|---|---|
| Omitted Burdens | $29,500.08 |
| Incorrect Daily Rate | $39,946.58 |
| LDs associated with delay from Subcontractor Mismanagement (87 Days) | $22,563.00 |
| Total Additional Costs omitted from proposed P/MC Responsible | $92,009.66 |

**Amount of LDs withheld per Contracting Officer's letter of 5 Dec 03**

| | CCD | BOD | Days | LD Rate | |
|---|---|---|---|---|---|
| Ph I Delays | 25-Jul-02 | 14-Mar-03 | 233 | $450.00 | $104,850.00 |
| Ph II Delays | 14-Mar-03 | 24-Jun-03 | 102 | $13.50 | $1,377.00 |
| Retention for LDs: | | | | | $106,227.00 |
| Other Retentions (Non-Compliance & Punchlist) | | | | | $1,323.00 |
| Total Retention: | | | | | $107,550.00 |

**CCD Extention Request for 9 Contemporaneous Claims**

| | Days | LD Rate | |
|---|---|---|---|
| Ph I Delays | 184 | $450.00 | $82,800.00 |

**P/MC Acknowledged Delay for Mismanagement of Subcontractors**

| | Days | LD Rate | |
|---|---|---|---|
| Ph I Delays | 49 | $450.00 | $22,050.00 |
| Ph II Delays | 38 | $13.50 | $513.00 |
| Total | 87 | | $22,563.00 |

| ASBCA Number | Claim Control Number | Daily Rate Proposed by P/MC | Days | Extended | Weighted Daily Average |
|---|---|---|---|---|---|
| 54349 | 03-022 | $818.21 | 28 | $22,909.88 | |
| 54394 | 03-023 | $721.29 | 42 | $30,294.18 | |
| 54331 | 03-025 | $1,106.39 | 82 | $90,723.98 | |
| 54332 | 03-026 | $507.14 | 18 | $9,128.52 | |
| 54333 | 03-027 | $1,073.77 | 84 | $90,196.68 | |
| 54484 | 04-003 | $507.14 | 23 | $11,664.22 | |
| | | | 277 | $254,917.46 | **$920.28** |

| | | |
|---|---|---|
| P/MC Proposed Days of Delay: | | 87 |
| Weighted Daily Avergage Rate: | | $920.28 |
| Subtotal | | $80,064.36 |
| Home Office Overhead: | 5.00% | $4,003.22 |
| Corrected Field Office Overhead: | | $84,067.58 |
| P/MC Proposed Field Office Overhead | | $44,121.00 |
| **Field Office Overhead Omitted:** | | **$39,946.58** |

COFD 06-S-019
Enclosure (4)

| | |
|---|---|
| Contract Price Through Modification P000015: | $1,229,385.00 |
| Proposed Cost Incurred: | $2,049,747.44 |
| Proposed Loss: | ($820,362.44) |
| LDs Retained: | ($107,550.00) |
| Proposed Total Loss: | ($927,912.44) |
| Proposed P/MC Contribution: | $187,366.00 |
| Initital Proposed Claim Amount: | ($740,546.44) |
| P/MC Accounting Adjustment of 5/7/04: | $45,600.00 |
| Revised Claim Amount: | ($694,946.44) |
| Total Compensation Proposed in 9 Contemporaneous Claims: | $541,067.00 |
| Subtotal | ($153,879.44) |
| Inappropriately Ommited Costs for P/MC-Responsible Issues: | $92,009.66 |
| Costs Rejected by DCAA: | $46,833.00 |
| **Residual Loss:** | **($15,036.78)** |