# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PHILLIPS/MAY CORPORATION | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CASE NO. **06-47**C |
| | § | |
| UNITED STATES OF AMERICA | § | (Judge Miller) |
| | § | |
| Defendant | § | |

## PLAINTIFF'S PROPOSED FINDING OF UNCONTROVERTED FACT

Pursuant to Rule 56 h(2) of the Rules of the United States Court of Federal Claims ("RCFC"), plaintiff, Phillips/May Corporation, respectfully submits the following proposed finding of uncontroverted fact in support of its response to defendant's motion for summary judgment.

1. Contract No. N62467-01-D-0257 ("the contract") was for the design and construction of the Religious Ministry Facility made up of a new one-story brick building approximately 5700 square feet in size and the re-hab of an existing chapel located next to the new building. (A 58[1] & Exhibit 13[2]).

2. The Notice to Proceed for the contract was issued on May 23, 2001 (Compl[3]. ¶ 2).

3. The contract was to be both designed and constructed in 256 calendar days (Compl. ¶ 10).

[1] "A__" refers to the Appendix filed by defendant with their Motion for Summary Judgment.

[2] "Exhibit__" refers to documents in chronological order that will be filed simultaneously with this Response to Defendant's Motion for Summary Judgment.

[3] "Compl." refers to the Complaint filed with this Court January 19, 2006.

4. It took the contractor until June 24, 2003 to complete the contract (A 267).

5. The total number of days to complete this contract exceeded 800 calendar days (April 11, 2001 - June 24, 2003) (Compl. ¶ 4 & A 267).

6. On or about November 7, 2003, plaintiff submitted a certified claim for delay, mal-administration of the contract, over-zealous inspection and impossibility ("the claim") to the Contracting Officer at the NAS-JRB, Fort Worth, alleging various government-caused direct and indirect cost increases experienced on the contract and demanded a final Contracting Officer's decision (Compl. ¶ 5).

7. On June 9, 2006, under an order from this Court, the Contracting Officer (C.O.) rendered his final decision denying the claim in its entirety (A 296-306 & Exhibit 11).

8. The final decision dated June 9, 2006, specifically found, concerning the issue of over-zealous inspection, that their inspector (Tom Schutze) was not guilty of this (A 299).

9. This was the first time that the C. O. had ever addressed the issue of over-zealous inspection in a final decision to a claim under this contract (Exhibits 1-8 & A 299).

10. The issue of "over inspection" was alleged in the first ASBCA hearing for the Phase II Delay claim (ASBCA 54331) (A 1-4).

11. The ASBCA in their decision on ASBCA 54331did not rule on the issue of over-inspection (A 217-221).

12. The issue of over-inspection or over-zealous inspection was never alleged in the other seven ASBCA appeals (A 5-41).

13. The issue of over-inspection or over-zealous inspection was never addressed or decided by the ASBCA in any of the eight appeals tried before them under this contract (A 217-265).

14. The claim for mal-administration of the contract was presented to the C.O. in plaintiff's certified claim dated November 7, 2003 (Compl. ¶ 3-9).

15. A claim for mal-administration of the contract had not been previously submitted in the nine claims under this contract appealed to the ASBCA (A 1-41 and 233-234).

16. A claim for mal-administration of the contract was never addressed or decided by

the ASBCA in any of the eight appeals tried before them under this contract (A 217-265).

17. The claim of impossibility of performance for the contract was presented to the C.O. in plaintiff's certified claim dated November 7, 2003 (Compl. ¶ 20).

18. A claim for impossibility of performance of the contract had not previously been submitted in the nine claims under this contract appealed to the ASBCA (A 1-41 & 233-234).

19. A claim for impossibility of performance of the contract was never addressed or decided by the ASBCA in any of the eight appeals tried before them under this contract (A 217-265).

20. A claim for delay associated with the issues of mal-administration or impossibility had not been previously submitted in the nine claims under the contract appealed to the ASBCA (A 1-41 & 233-234).

21. A claim for delay associated with the issues of over-zealous inspection, mal-administration or impossibility was never decided by the ASBCA in any of the eight appeals tried before them under this contract (A 217-265).

## MAL - ADMINISTRATION

22. The Navy had a Design/Build Manual ("the Manual"), to be followed in the administration of the contract (Compl. ¶ 11 & Exhibit 14).

23. The Manual contemplated construction being accomplished during the design of a project (Compl ¶ 11 & Exhibit 14, first page [un-numbered]).

24. The Manual had as one of its goals, to integrate the design and build process to complete an optimum quality facility (Compl.¶ 12 and Exhibit 14: step 8).

25. Plaintiff was not provided sufficient design approval by defendant to begin construction work until December 21, 2001 (Compl. ¶ 9 and Exhibit 15).

26. By December 21, 2001, of the original 256 days of contract time, 253 had expired (Compl. ¶ 10 & Exhibit 13).

27. The Manual contemplates the use of "partnering" (Compl. ¶ 13 and Exhibit 14, step 8).

28. The contract itself has a "partnering" clause (Compl. ¶ 13).

29. The Navy failed to partner with plaintiff during the entire life of this contract (Exhibit 10).

30. The Manual advises against changes to the design which results in cost or time growth (Compl. ¶ 14 and Exhibit 14, step 8, c).

31. The Manual states that a project will be schedule driven and that both the Navy and the contractor share the responsibility to keep the project on schedule (Compl. ¶ 15 and Exhibit 14, step 8[f]).

32. The Navy placed the complete responsibility for the schedule on the plaintiff for this contract (Exhibit 10).

33. The Manual warns against having re-work (Compl. ¶ 16 & Exhibit 14, 8.g).

34. There was re-work all throughout this contract (Exhibit 10).

35. The Manual notes that construction shall match the accepted design and the contractor shall not deviate from the accepted design without government approval (Compl. ¶ 17 & Exhibit 14, step 8, h).

36. The Navy deviated from the accepted design without approval during the life of this contract (Exhibit 10).

37. The Construction Quality Management Program (CQMP) is a published manual created by the Navy in January 2000 (Exhibit 16 - cover sheet & p.i).

38. Compliance with the requirements and procedures outlined in the CQMP is required on all Naval Facilities Engineering Commands (NAVFAC) construction contracts in the United States and its territories (Exhibit 16, p.i).

39. The Navy's Construction Management's mission set out in the CQMP is, among other things, to deliver its client's projects on or ahead of schedule (Exhibit 16, p. ii).

40. It took more than three times the original contract period to complete the contract for the Religious Ministry Facility (Compl. ¶ 4 & A 267).

41. The Navy's Construction Management's mission set out in the CQMP is, among other things, to deliver its client's projects at fair and reasonable costs (Exhibit 16, p. ii).

42. Plaintiff suffered a financial loss on this contract (Compl. ¶ 21).

43. The Navy's Construction Management's mission set out in the CQMP is, among other things, for its NAVFAC Project Managers, engineers and QA Representatives to transition from being reactive inspectors to being proactive quality assurance representatives (Exhibit 16, p. iii).

44. The Navy's QAR continued to perform as a reactive inspector for this contract (Exhibit 10).

45. The Navy's Construction Management's mission set out in the CQMP is, among other things, for its NAVFAC Project Managers, engineers and QA Representatives to discover problems immediately because, "...Discovering problems after the fact is no longer acceptable..." (Exhibit 16, p. iii).

46. There was re-work required throughout this contract (Exhibit 10).

47. The CQMP defines Quality Assurance (QA) as being the system by which the Government verifies that the contractor's System of Quality Control (QC) is working effectively and construction complies with the contract requirements (Exhibit 16, p. 3-1).

48. The CQMP defines Quality Assurance System as a systematic approach to monitoring the contractor's performance (Exhibit 16, p 3-1).

49. The role of the Quality Assurance Representative (QAR) set out in the CQMP is to be cognizant of the contractor's activities in order to monitor the critical work elements (Exhibit 16, p. 3-10).

50. The Navy's QAR inspected much more than just the critical work elements (Exhibits 10 & 18).

51. The CQMP makes it mandatory that the QAR must daily review all contractor reports and inform his supervisor of any errors or omissions. Further, it requires reports inconsistent with the QAR's personal knowledge to be reconciled immediately (Exhibit 16, p. 3-10).

52. The CQMP requires the QAR to note any disagreement in question regarding the accuracy and completeness of a QC report in the QAR's remarks section found in each QC report (Exhibit 16, p. 3-13).

53. The CQMP states that "...Failure to take exception to incorrect information contained in the report [the QC report] constitutes constructive acceptance of the contractor's version of events (Exhibit 16, p. 3-14).

54. The QAR never challenged the accuracy or completeness of any of the QC reports nor did he ever add any comments to these reports in the QAR's remarks section (Exhibits 10 & 18).

55. Numerous Requests for Information (RFI) were made on this contract (Compl. 21(f) & Exhibit 17).

56. The contract provided for a 7-day response to most RFI's (Compl. 21(f))

57. Defendant failed to provide a timely response to the first 14 RFI's submitted (Exhibit 17).

58. Defendant took more than 100 days to respond to six of the first 14 RFI's (Exhibit 17).

## INSPECTION

59. Quality Assurance is the Government's system in place to monitor the quality control efforts of the construction contractor (Exhibit 16, p.1-5).

60. Quality Control is the contractor's system in place to manage, control and document construction activities in order to comply with contract requirements (Exhibit 16, p 1-5).

61. Defendant's Quality Assurance Representative (QAR) (Mr. Tom Schutze) did not prepare a daily log on the contract (Compl. ¶ 21(k) & Exhibit 10)

62. The only daily log prepared on the contract was prepared by plaintiff (Compl. ¶ 32 & Exhibit 18).

63. Plaintiff's daily log has a space at the bottom of the form for corrections , if necessary, which were to be done by defendant's QAR (Exhibits 10 & 18.)

64. Defendant's QAR never made or required any corrections on any of the daily logs prepared for this contract (Exhibits 10 & 18).

65. The daily logs prepared by plaintiff are the only day to day record of the activities on the job site for the contract (Exhibit 10).

66. According to the daily logs, on February 22, 2002, Tom Schutze insisted that specific details for certain steel work be submitted to him prior to his approving this work (Exhibit 18).

67. According to the daily logs, on March 27, 2002, Tom Schutze discussed the loading requirements on both sides of the east side stem wall contrary to the contract drawings (Exhibit 18).

68. According to the daily logs, on April 2, 2002, Tom Schutze inquired as to testing on the primer thickness of the paint on the structural steel (Exhibit 18).

69. According to the daily logs, on April 2, 2002, Tom Schutze inquired as to why the ductile iron pipe was not mortar lined (Exhibit 18).

70. According to the daily logs, on April 5, 2002, Tom Schutze was on site to discuss the fire main details and roof line details (Exhibit 18).

71. According to the daily logs, on April 11, 2002, Tom Schutze was on site checking certain stainless steel bolts (Exhibit 18).

72. According to the daily logs, on April 19, 2002, Tom Schutze inquired about certain control joints in the concrete placement (Exhibit 18).

73. According to the daily logs, on April 24, 2002, Tom Schutze was on site to discuss various details for upcoming work (Exhibit 18).

74. According to the daily logs, on May 20, 2002, Tom Schutze was on site to discuss the placement of certain trusses (Exhibit 18).

75. According to the daily logs, on May 20, 2002, Tom Schutze made changes to the brick ledge flashing (Exhibit 18).

76. According to the daily logs, on May 28, 2002, Tom Schutze inspected the work in progress and warned the Contractor that he was proceeding at his own risk (Exhibit 18).

77. According to the daily logs, on June 27, 2002, Tom Schutze insisted he be allowed to inspect walls before the Contractor finished them (Exhibit 18).

78. According to the daily logs, on June 27, 2002, Tom Schutze requested certain shop drawings (Exhibit 18).

79. The Navy Contracting Officer was aware of the allegations of over-inspection by the QAR (Exhibit 19).

80. According to the daily logs, on October 1, 2002, Tom Schutze required the removal of Contractor personnel from the roof of the building (Exhibit 18).

81. According to the daily logs, on October 3, 2002, Tom Schutze requested test results on certain soil analysis as well as checking on the percentages of recycled material in the hydro mulch (Exhibit 18).

82. According to the daily logs, on October 8, 2002, Tom Schutze did various inspection work in the attic area of the new building (Exhibit 18).

83. According to the daily logs, on October 15, 2002, Tom Schutze stated the roof may not be per the RFF (Exhibit 18).

84. According to the daily logs, on October 23, 2002, Tom Schutze determined the location of fire alarm transmissions antenna and the type of glass to be used in all mirrors (Exhibit 18).

85. According to the daily logs, on November 1, 2002, Tom Schutze did various inspection work above the ceilings concerning insulation duct work (Exhibit 18).

86. According to the daily logs, on December 6, 2002, Tom Schutze determined the work to be done concerning chilled water line insulation repair; the closing of a wall as well as other work dealing with valves for heating and chilled water at the existing Chapel (Exhibit 18).

87. According to the daily logs, on January 27, 2003, Tom Schutze directed certain work on the baths (Exhibit 18).

88. According to the daily logs, on February 4, 2003, Tom Schutze inspected the attic space (Exhibit 18).

89. According to the daily logs, on February 12, 2003, Tom Schutze reviewed certain mechanical work (Exhibit 18).

90. According to the daily logs, on February 28, 2003, Tom Schutze came up with additional electrical deficiencies that he had previously overlooked (Exhibit 18).

## EXAMPLES OF THE Q.A.R. DIRECTING WORK

91. According to the daily logs, on February 20, 2002, Tom Schutze directed corrective actions for the foundation design (Exhibit 18).

92. According to the daily logs, on April 5, 2002, Tom Schutze directed the Contractor to notify him of certain tests he wished to observe (Exhibit 18).

93. According to the daily logs, on April 10, 2002, Tom Schutze directed the Contractor to re-test certain sub-grade (Exhibit 18).

94. According to the daily logs, on April 18, 2002, Tom Schutze directed how certain box outs were to be done (Exhibit 18).

95. According to the daily logs, on May 9, 2002, Tom Schutze discussed methods for correction of steel and plumbing rough-in (Exhibit 18).

96. According to the daily logs, on June 11, 2002, Tom Schutze looked at various minor items in the work in progress (Exhibit 18).

97. According to the daily logs, on June 20, 2002, Tom Schutze, contrary to the manufacturer's installation instructions, directed the overlap of paper end on insulation being installed in the walls (Exhibit 18).

98. According to the daily logs, on June 20, 2002, Tom Schutze asked for certain bolts to be replaced (Exhibit 18).

99. According to the daily logs, on July 17, 2002, Tom Schutze pointed out problems that the mechanical subcontractor was having with the insulation installation (Exhibit 18).

100. According to the daily logs, on July 26, 2002, Tom Schutze discussed the method of texturing various walls in accordance with the way the ROICC Office wanted them (Exhibit 18).

101. According to the daily logs, on August 13, 2002, Tom Schutze picked out some of the stain colors to be used. On this same date he also requested repairs to a retaining wall (Exhibit 18).

102. According to the daily logs, on August 21, 2002, Tom Schutze directed the work concerning the broom finish on the sidewalk, the tile layout in the bathrooms, the insulation on the chiller lines on the southwest wall and the placement of boots cut in the interior AC supply line (Exhibit 18).

103. According to the daily logs, on August 22, 2002, Tom Schutze directed the tile subcontractor to not cut any of the floor tiles (Exhibit 18).

104. According to the daily logs, on August 28, 2002, Tom Schutze talked to some of the subcontractors at the job site (Exhibit 18).

105. According to the daily logs, on August 28, 2002, Tom Schutze directed the Contractor concerning finishes on doors and bookshelves (Exhibit 18).

106. According to the daily logs, on September 11, 2002, Tom Schutze directed the staining process for certain millwork and specified which products to use (Exhibit 18).

107. According to the daily logs, on September 11, 2002, Tom Schutze changed the finish to be placed on certain millwork (He changed this four different times.) (Exhibit 18).

108. According to the daily logs, on September 11, 2002, Tom Schutze directed additional plaqueing be added to a door (Exhibit 18).

109. According to the daily logs, on September 11, 2002, Tom Schutze picked the colors on the bath partitions, kitchen cabinet Formica and countertops (Exhibit 18).

110. According to the daily logs, on September 20, 2002, Tom Schutze directed the work of the non-slip nosing on the concrete steps as well as certain ceiling work (Exhibit 18).

111. According to the daily logs, on September 20, 2002, Tom Schutze directed how certain mechanical work was to be installed (Exhibit 18).

112. According to the daily logs, on September 20, 2002, Tom Schutze directed the Contractor not to use certain pressure sensitive tape even though it was allowed by the Contract (Exhibit 18).

113. According to the daily logs, on September 20, 2002, Tom Schutze prevented the Contractor from placing concrete in the entry steps (Exhibit 18).

114. According to the daily logs, on September 23, 2002, Tom Schutze continued to reject stair nosing which was to be used for the steps at the main entry. None was specified in the Contract (Exhibit 18).

115. According to the daily logs, on September 23, 2002, Tom Schutze specifically directed the Contractor as to which insulation and its manner of installation was to be done on the hot water hydronic piping, all of which was contrary to the Contract as well as the manufacturer's recommendations (Exhibit 18).

116. According to the daily logs, on September 25, 2002, Tom Schutze directed the Contractor's work concerning the hinges for cabinet doors, method of testing asphalt and installation of the door in the janitor's closet (Exhibit 18).

117. According to the daily logs, on October 7, 2002, Tom Schutze "requested" the size brackets to be installed in the coat room closet (Exhibit 18).

118. According to the daily logs, on December 30, 2002, Tom Schutze's direction to install certain door trim resulted in interference with the door-closer installation (Exhibit 18).

119. According to the daily logs, on February 13, 2003, Tom Schutze requested the water heater be raised 18 inches above the pad. This was not a Contract requirement (Exhibit 18).

120. According to the daily logs, on February 27, 2003, Tom Schutze made various threats to the contractor's superintendent (Exhibit 18).

121. According to the daily logs, on April 21, 2003, Tom Schutze directed the removal of certain cabinets in the nursery area, Phase II (Exhibit 18).

122. According to the daily logs, on April 28, 2003, Tom Schutze refused to allow any sub-contractor on the job site except for the testing and balancing sub-contractor (Exhibit 18).

## IMPROPER CONDUCT BY THE Q.A.R.

123. According to the Quality Control Inspector's diary, January 4, 2002, Tom Schutze requested he be given certain demo-ed materials from the job site (Exhibit 19).

124. According to the Quality Control Inspector's diary, on March 22, 2002, Tom Schutze required a job site clean up and through intimidation, acquired all leftover materials for his own personal use (Exhibit 19).

125. According to the Quality Control Inspector's diary, on May 24, 2002, Tom Schutze requested for his own personal use, certain trusses as well as some steel from the job site, promising to go easier on the contractor if he was given these items (Exhibit 11).

Respectfully submitted,

**s/David A. Tomlinson**

DAVID A. TOMLINSON
5716 Tee Box Court
Granbury, Texas 76049
817-578-8199
Attorney of Record for Plaintiff
PHILLIPS/MAY CORPORATION

electronically filed
November 27, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that on the 27th day of November, 2006, a copy of the foregoing "PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT"was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

**s/David A. Tomlinson**